[881 NE2d 193, 851 NYS2d 97]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JAMES
ZIMMERMAN, Respondent.

Argued October 9, 2007; decided December 13, 2007

**POINTS OF COUNSEL**

*Andrew M. Cuomo, Attorney General,* New York City (*Roseann B. MacKechnie* and *Barbara D. Underwood* of counsel), for appellant. The evidence before the grand jury established venue in New York County because, at the time defendant made his perjurious statements in Ohio, he knew those statements were likely to have a materially harmful impact on governmental processes in New York County. (*People v McLaughlin,* 80 NY2d 466; *Matter of Murtagh v Leibowitz,* 303 NY 311; *People v Greenberg,* 89 NY2d 553; *People v Fea,* 47 NY2d 70; *People v Licenziata,* 199 App Div 106; *Matter of Taub v Altman,* 3 NY3d 30; *Matter of Steingut v Gold,* 42 NY2d 311; *People v Moore,* 46 NY2d 1; *People v Jensen,* 86 NY2d 248; *People v Jennings,* 69 NY2d 103.)

*Steven R. Kartagener,* New York City, and *Thomas Fitzpatrick* for respondent. The courts below correctly ruled that the New York County grand jury lacked the power to indict respondent for perjury allegedly committed in Cincinnati, Ohio, under the so-called "particular effect" theory of geographical jurisdiction (venue), since the proof before the grand jury could not and did not establish that respondent's alleged conduct "had, or was likely to have, a particular effect upon such county," or that respondent committed perjury with "the intent that it would, or with knowledge that it was likely to, have such particular effect" on New York County. (*Matter of Taub v Altman,* 3 NY3d 30; *People v Fea,* 47 NY2d 70; *Matter of Steingut v Gold,* 42 NY2d 311; *People v Sandy,* 236 AD2d 104, 91 NY2d 977; *People v Rodriguez y Paz,* 58 NY2d 327; *People v Greenberg,* 89 NY2d 553; *People v Moore,* 46 NY2d 1; *Matter of Murtagh v Leibowitz,* 303 NY 311; *People v Hetenyi,* 277 App Div 310, 301 NY 757; *People v Culhane,* 33 NY2d 90.)

**OPINION OF THE COURT**

Ciparick, J.

This appeal asks us to determine whether defendant is subject to "particular effect" jurisdiction, or venue, as set forth in CPL article 20, in New York County. We conclude that he is not.

In 2002, the New York Attorney General's office began an antitrust investigation into suspected unlawful conduct by

Federated Department Stores and May Department Stores. The Attorney General sought to determine whether Federated and May conspired with Waterford Wedgwood USA and Lenox, Inc.—manufacturers of fine crystal and china—to restrain the sale of such products by Bed, Bath and Beyond, a competitor of Federated and May. During the investigation, the Attorney General subpoenaed documents from the companies and testimony from their current and former employees.

Prior to Federated's compliance with the subpoena duces tecum, the Attorney General and Federated entered into a confidentiality agreement, which provided that any dispute regarding the disclosure or classification of documents would be brought in New York County Supreme Court. The agreement was sent to and signed by Federated's attorney in Washington, D.C.

Defendant, James Zimmerman, who was the chairman and chief executive officer of Federated from 1998 until his retirement in February 2004, was among the witnesses examined under oath as a part of the investigation. The Attorney General sought to examine defendant at the Antitrust Bureau's New York County office, but as an accommodation to him, the Attorney General agreed to conduct the examination at Federated's corporate headquarters in Cincinnati, Ohio.

The examination was held on April 9, 2004. At that time, an oath was administered by the court reporter, who was also an Ohio notary public. Defendant was represented at the examination by his Washington, D.C. attorney, who signed the confidentiality agreement. During the examination, the Attorney General extensively questioned defendant regarding an alleged conversation he had with Waterford's chairman of the board on June 11, 2001.

A couple of months later, the Attorney General's office notified Federated, May, Waterford and Lenox that it was prepared to commence a lawsuit against them, alleging violations of the Donnelly Act and Executive Law § 63 (12). But before the action was commenced, the Attorney General resumed settlement negotiations that resulted in the four companies each entering into settlement agreements with the Attorney General.

Meanwhile, following defendant's examination, the Attorney General commenced a grand jury investigation in New York County into defendant's alleged perjury during his examination. As part of the charge to the grand jury, the Attorney General

read the statutory provisions that govern "particular effect" jurisdiction and venue as set forth in CPL 20.20 (2) (b)[1] (state jurisdiction), 20.10 (4)[2] (definition of "particular effect") and 20.40 (2) (c)[3] (county jurisdiction). In January 2005, the grand jury indicted defendant for perjury in the first degree (Penal Law § 210.15), charging him with six instances of testifying falsely. The indictment also alleged "that the crime of Perjury in the First Degree was designed to prevent a particular effect in the County and State of New York and . . . that the defendant's conduct . . . was performed with intent that it would, and knowledge that it would be likely to, have such an effect herein."

Defendant, in an omnibus motion, moved to dismiss the indictment, arguing that "particular effect" venue, pursuant to CPL 20.40 (2) (c), did not lie in New York County. Defendant conceded that New York State had jurisdiction pursuant to CPL 20.20 (2) (b). Citing *Matter of Taub v Altman* (3 NY3d 30 [2004]), however, defendant argued that his alleged perjury had no perceptible impact on the governmental processes of that county and that there was no evidence that he actually intended or was aware that his alleged perjury would have a deleterious

---

1. CPL 20.20 (2) (b) provides that
   "a person may be convicted in the criminal courts of this state of an offense . . . when: . . .
   "[e]ven though none of the conduct constituting such offense may have occurred within this state . . .
   "[t]he statute defining the offense is designed to prevent the occurrence of a particular effect in this state and the conduct constituting the offense committed was performed with intent that it would have such effect herein."

2. CPL 20.10 (4) defines "[p]articular effect of an offense" as "[w]hen conduct constituting an offense produces consequences which, though not necessarily amounting to a result or element of such offense, have a materially harmful impact upon the governmental processes or community welfare of a particular jurisdiction, or result in the defrauding of persons in such jurisdiction."

3. CPL 20.40 (2) (c) provides that
   "[a] person may be convicted in an appropriate criminal court of a particular county, of an offense of which the criminal courts of this state have jurisdiction pursuant to section 20.20 . . . when: . . .
   "[e]ven though none of the conduct constituting such offense may have occurred within such county . . .
   "[s]uch conduct had, or was likely to have, a particular effect upon such county or a political subdivision or part thereof, and was performed with intent that it would, or with knowledge that it was likely to, have such particular effect therein."

effect on the governmental or judicial processes of New York County. The People opposed the motion and argued that the evidence presented to the grand jury established that defendant acted with either the intent or knowledge that his actions would affect the antitrust investigation being conducted in New York County.

Supreme Court granted defendant's motion, dismissed the indictment and held that defendant's acts had no "particular effect" upon New York County. The Appellate Division affirmed and noted that "[c]riminal conduct constituting an offense has a 'particular effect' upon a county when it 'produces consequences which . . . have a materially harmful impact upon the governmental processes or community welfare of [the] particular [county], or result in the defrauding of persons in such [county]' " (32 AD3d 345, 346 [2006], quoting CPL 20.10 [4]). The Appellate Division found that

> "the evidence did not establish that, at the time *defendant* made his allegedly false statement, *he* was aware of the facts relied upon by appellant for this claim. Instead, all that can be reasonably inferred from the facts is that at the time he made his statements in Ohio, defendant knew his conduct would have a deleterious effect on the governmental or judicial processes of the State of New York, but not on any particular county" (*id.*, citing *Taub*).

A Judge of this Court granted leave to appeal, and we now affirm.

In *Taub*, we opined that

> "in order for prosecutorial jurisdiction to lie in New York County, it is that county . . . that must suffer a particular effect as a result of defendants' alleged conduct. The statutory requirement that the conduct have a materially harmful impact may thus be satisfied only by a 'concrete and identifiable injury' to either the county's governmental processes (that is, the executive, legislative or judicial branch of government) or the welfare of the county's community. Moreover, to be materially harmful, the impact must be more than minor or incidental, and the conduct must harm 'the well being of the community as a whole,' not merely a particular individual" (*Taub*, 3 NY3d at 33-34 [citations omitted]).

Further, "because the jurisdiction of the county seeking to prosecute must be established before the grand jury, the type of injury or offense contemplated by the particular effect statute must 'be perceptible and of the character and type which can be demonstrated by proof before a [g]rand [j]ury' " (*Taub* at 34, quoting *Matter of Steingut v Gold*, 42 NY2d 311, 317 [1977]).

The question presented here, as in *Taub*, is whether the evidence before the grand jury established a concrete and identifiable injury suffered specifically by New York County. The People rely upon instances of defendant's conduct that purportedly affected New York County's judicial processes. The People also contend that certain statements evince a concrete and identifiable injury suffered by New York County and that at the time defendant made the alleged perjurious statements in Ohio, he knew that they were likely to have a materially harmful impact on judicial processes in New York County. That is, he must have known that the Attorney General's antitrust investigation might lead to civil litigation or criminal charges, proceedings that would necessarily be brought in New York County.

Defendant, on the other hand, argues that a New York County grand jury was without authority to indict him for perjury under the particular effect theory of geographical jurisdiction. Defendant contends that the proof that was presented to the grand jury failed to establish that his alleged conduct had or was likely to have a materially harmful impact on New York County or that he had the intent or knowledge that it would have such particular effect on the County.

Defendant's argument should prevail because there was no evidence before the grand jury that could reasonably lead to the conclusion that when defendant allegedly testified falsely in Ohio, he did so with the intent or knowledge that his actions would have a material and harmful effect on New York County's judicial processes. The subpoena for his testimony had not issued from a New York County grand jury, but rather from the Attorney General's office itself, pursuant to its subpoena powers.

At common law and under the State Constitution, a defendant has the right to be tried in the county where the crime was committed unless the Legislature has provided otherwise (*see People v Moore*, 46 NY2d 1, 6 [1978], citing NY Const, art I, § 2,

and *People v Goldswer*, 39 NY2d 656, 659-661 [1976]).[4] "So stringently was that rule applied, at common law, that where the alleged act was performed in part in one county and in part in another or others, venue was in neither county, and prosecution could not be had at all" (*Matter of Murtagh v Leibowitz*, 303 NY 311, 316 [1951]).[5] The Legislature sought to correct that situation by enacting venue statutes that permit the prosecution of certain actions in other counties under certain very specific conditions (*see id.*; *see also People v Nicoll*, 3 AD2d 64, 70-71 [4th Dept 1956] [reciting early history of multiple county jurisdiction]). Thus, "[a]bsent [a] statutory exception, . . . the territorial unit for criminal prosecutions is [a] county" (*People v Fea*, 47 NY2d 70, 75 [1979]).

Our previous cases illustrate the limits of county jurisdiction. In *Fea*, the People sought to prosecute the defendant in Bronx County for allegedly assaulting an individual in Rockland County. The assaults were intended to compel usurious loan payments in Bronx County. The People argued that defendant's assaults had a materially harmful impact upon the community welfare of Bronx County. We reversed the conviction and dismissed the indictment, holding that "[e]xtraterritorial jurisdiction is to be applied only in those limited circumstances where the out-of-jurisdiction conduct is violative of a statute intended to protect the integrity of the governmental processes or is harmful to the community as a whole" (*Fea*, 47 NY2d at 76-77).

In *Steingut* (42 NY2d 311 [1977]), the petitioners were indicted in Kings County for the corrupt use of position or authority, in violation of Election Law § 448, for promising to assist in obtaining appointment to a position on the Civilian Complaint Review Board of the New York City Police Department in exchange for fund-raising services. The alleged promise occurred while the petitioners were at a luncheon meeting in New York County. The Kings County prosecutor asserted "par-

---

4. The Legislature has created other statutory exceptions to strict territorial principles of geographical jurisdiction, such as Judiciary Law § 177-a, which authorized "special narcotics parts in the supreme court . . . to hear and determine narcotic cases from within counties wholly contained" by New York City. That statute effectively "removed the 'traditional jurisdictional boundaries' and combined all five counties of New York City into a single unit for purposes of prosecuting narcotics indictments" (*People v Rodriguez y Paz*, 58 NY2d 327, 333 [1983]).

5. *Matter of Murtagh* concerned section 134 of the Code of Criminal Procedure, the predecessor statute to CPL 20.40.

ticular effect'' venue based on the fact that the fund-raising was to support an election that was to take place in Kings County. We concluded that where the election was to take place was an amorphous fact that the Legislature clearly did not intend to be dispositive in determining venue (*see Steingut*, 42 NY2d at 317).

We further noted in *Steingut* that the application of the statute was best illustrated by an example in a practice commentary "in which the culprit maliciously blows up a dam in Putnam County near the Westchester County line, thus flooding some Westchester territory—a result which he either intends or knows is likely to occur. In such case, jurisdiction of the crime lies in Westchester as well as in Putnam" (*Steingut* at 317 [citation omitted]). We held that "[i]n the case before us there was no perceptible material harmful impact such as the physical intrusion noted in the commentary or other types of impact" (*id.* at 318).

The difficulty in applying CPL 20.40 (2) (c) to the situation here is that it defines "jurisdiction of counties," or venue, in the same terms used by CPL 20.20 (2) (b) to define the jurisdiction of the State. Under section 20.20 (2) (b), the State has jurisdiction if the statute defining the offense is designed to prevent a "particular effect in this state" and defendant's criminal conduct "was performed with intent that it would have such effect herein." CPL 20.10 (4) defines "particular effect," as relevant here, to mean "consequences which . . . have a materially harmful impact upon the governmental processes or community welfare of a particular jurisdiction."

Section 20.40 (2) (c) tracks section 20.20 (2) (b), with some variation; it says that a county has jurisdiction if the defendant's "conduct had, or was likely to have, a particular effect upon such county or a political subdivision or part thereof, and was performed with intent that it would, or with knowledge that it was likely to, have such particular effect therein." The parallelism between the approach of the state jurisdiction and county jurisdiction statutes appears, in hindsight, to be unworkable. The "jurisdiction" of the State and the "jurisdiction" of a county are fundamentally different from each other.

The State is a sovereign, and its power is limited by its boundaries. It can punish people for conduct committed outside those boundaries only in limited circumstances, as defined by section 20.20. But counties are not sovereigns; they are subdivisions of the State. If the State has jurisdiction of a case it may, as a gen-

eral rule, assign the trial of that case to any county it chooses. Thus, in enacting CPL 20.40 to regulate the "jurisdiction" of counties, the authors of the Criminal Procedure Law did not need to be concerned with limitations on sovereign power. More specifically, they did not need to require, as a precondition to venue, a "particular effect" upon a single "county or a political subdivision or part thereof"; nor did they need to require that the defendant intend such an effect or know that it is likely to occur. But they did impose those requirements, apparently overlooking at least two possibilities: (1) a defendant's conduct might affect, or be intended or be likely to affect, the State of New York as a whole, rather than a county or some smaller unit of government; and (2) a defendant might intend an effect within the state without knowing in which county or counties the effect will occur. In these two situations, the statute leaves a gap; the State has jurisdiction, but no county does.

Here, the first of the possibilities overlooked by the Legislature is involved. Defendant's perjury, if the charge against him is true, was obviously designed to mislead the New York State Attorney General and frustrate his investigation. Thus defendant's act was performed with the intent that it would have a "particular effect" on the State—"a materially harmful impact upon" the State's "governmental processes." But there was no evidence presented to the grand jury indicating that defendant's conduct was intended to have or, as far as defendant knew, was likely to have any "materially harmful impact" on the "governmental processes or community welfare" of any "county or a political subdivision or part thereof."

Specifically, the confidentiality agreement, which named New York County as the venue for any dispute arising from the classification and disclosure of confidential information, was sent to, and signed by, Federated's attorney in Washington, D.C. No grand jury testimony, however, indicates that defendant knew of the venue provision in the confidentiality agreement. Further, an Assistant Attorney General's grand jury testimony relating to defendant's examination focuses on defendant's alleged perjurious statements, not on his state of mind. The testimony does indicate that defendant was aware that the Attorney General was investigating certain meetings that had taken place at Federated Department Stores' offices in New York City, and that defendant was initially issued a subpoena to appear at the Attorney General's offices in Manhattan to be examined. But awareness of a New York City-centered investigation is not evi-

dence that defendant acted with knowledge that his conduct would impact New York County's governmental and judicial processes, nor can such an inference reasonably be drawn.

In conclusion, because evidence presented to the grand jury did not establish that defendant intended or knew that his alleged perjurious statements would have a concrete and identifiable injury to either New York County's governmental processes or the welfare of the County's community, "particular effect" jurisdiction, or venue, is not sustainable. Certainly, this result reflects a "Catch-22" situation. And it is lamentable that, although defendant's acts admittedly could have caused a "concrete and identifiable" injury to New York State generally, there is not a single county in the state where this prosecution could be brought given the current statutory scheme. Again, the gap in the "particular effect" venue statutory scheme that we identified in *Taub* cannot be filled by this Court. The Legislature, however, may do so.

Accordingly, the order of the Appellate Division should be affirmed.

READ, J. (dissenting). At common law, a criminal defendant could only be tried in the county where a crime was actually committed. Over a century ago, however, the Legislature relaxed this standard statutorily so as to prevent "miscarriage of justice." Almost 90 years later, a comprehensive new Criminal Procedure Law expanded upon the then existing remedial statute, with the CPL's drafters noting that "[i]n general, . . . multiple county jurisdiction is bestowed *more liberally* than state jurisdiction" (Commn Staff Notes, reprinted following CPL 20.40 in NY CLS, Book 7, at 109 [emphasis added]). Yet today a majority of the Court concludes that there is no geographical jurisdiction over this criminal defendant in any New York county even though geographical jurisdiction was concededly proper in New York State. Neither the CPL's text nor our past decisions mandate such an irrational result. I respectfully dissent.

## Statutory Text and Legislative History

The specific question posed by this appeal is whether the evidence presented to the grand jury satisfies jurisdiction in New York County within the meaning of CPL 20.40 (2) (c). In order to answer this question, we must construe CPL 20.40 (2) (c), which grants so-called "particular effect" jurisdiction to New

York counties. Because "[i]t is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998] [internal quotation marks and citations omitted]), our goal should be to apply CPL 20.40 (2) (c) to this case *as the Legislature would have intended it to apply*. Since "the clearest indicator of legislative intent is the statutory text" (*Majewski*, 91 NY2d at 583), our starting point in construing CPL 20.40 must be the provision's language.

CPL 20.40 states that "[a] person may be convicted in an appropriate criminal court of a particular county, of an offense of which the criminal courts of this state have jurisdiction pursuant to section 20.20 . . . when" any one of 19 statutory subsections is fulfilled. Subdivision (2) (c) vests geographical jurisdiction in a county "[e]ven though none of the conduct constituting such offense may have occurred within such county" if "[s]uch conduct had, or was likely to have, a particular effect upon such county or a political subdivision or part thereof, and was performed with intent that it would, or with knowledge that it was likely to, have such particular effect therein." Relatedly, CPL 20.10 (4) defines a "particular effect" as a "materially harmful impact upon the governmental processes or community welfare of" the county seeking to assert jurisdiction.

Where "the natural signification of the words employed" in a statute leaves "no room for construction . . . courts have no right to add to or take away from that meaning" and the task of judicial interpretation is finished (*Majewski*, 91 NY2d at 583 [internal quotation marks and citations omitted]). Here, the CPL's text does not define "materially harmful impact," "governmental processes," or "community welfare"; nor does the text explain whether "particular" modifies "county" in addition to "effect." Because the text of CPL 20.40 (2) (c) is not "too clear for construction" (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 76), we need to examine its legislative history—in particular, its general and specific derivation—in order to glean and "effectuate the intent of the Legislature."

The drafting history of CPL 20.40 (2) establishes certain points critical to this appeal. First, CPL 20.40 (2) is a remedial statute, intended by the Legislature to remedy gaps in county jurisdiction created by the strict common-law rule of vicinage. Under the common law, a crime could only be prosecuted in a county in which all elements were performed; as a result, there was a jurisdictional "gap" for crimes that crossed county lines

(for example, death is a result element of murder; if a defendant stabbed a victim in Nassau County, and the victim staggered into Queens County before dying, common-law vicinage would allow for jurisdiction in neither county).

As far back as 1881, however, the Legislature saw fit to remedy this deficiency in county jurisdiction, passing section 134 of the Code of Criminal Procedure (CCrP), a statute providing that "[w]hen a crime is committed, partly in one county and partly in another . . . the jurisdiction is in either county." New York courts interpreting CCrP § 134 recognized the statute as remedial and therefore refused attempts to adopt "construction[s of the statute] that w[ere] never intended and which, to say the least, would be extremely technical" (*People v Licenziata*, 199 App Div 106, 110 [2d Dept 1921]).

In the 1960s, New York overhauled its criminal law and its law of criminal procedure, appointing a Temporary Commission on Revision of the Penal Law and Criminal Code. The Commission's efforts led to the 1970 Criminal Procedure Law (*see* L 1970, ch 996), a "complete reconstruction from the ground up" in which "[t]he changes in substance w[ere] numerous and frequently of a fundamental nature" (6th Interim Rep of Temp Commn on Rev of Penal Law and Crim Code, 1967 NY Legis Doc No. 6, at 7). That said, many CPL provisions had some counterpart in the predecessor CCrP, and the CPL itself contains a derivation table indicating any CPL sections that were "specifically or generally derived" from coordinate provisions of the CCrP. As relevant here, this table shows that section 20.40 (2) traces its general origins to CCrP § 134 (*see* L 1970, ch 996, at 3387).

While CPL 20.40 (2), like its general predecessor CCrP § 134, was a legislative remedy to strict common-law vicinage, the CPL did more than merely recodify the preexisting law of county jurisdiction, which the Commission described as "meager and shallow" (Staff Comment of Temp St Commn on Rev of Penal Law and Crim Code, 1967 Proposed NY CPL 10.40, at 45). Explaining section 10.40 (the forerunner of CPL 20.40), the Commission Staff wrote,

> "The rules governing the jurisdiction of this state over offenses which may also be within the jurisdiction of another state are quite comparable to those governing the jurisdiction of a county over offenses which may also be within the jurisdiction of another

county. *In general, however, multiple county juris-
diction is bestowed more liberally than state juris-
diction, and there are several kinds of situations in
which a county acquires jurisdiction of an offense
pursuant to this section where the state, in an analo-
gous inter-state situation, would not acquire juris-
diction under section 10.20"* (*id.* at 45 [emphasis
added]).

Thus, in addition to citing CPL 20.40 (2)'s remedial predeces-
sor, the drafters of the CPL explained that while state and
county geographical jurisdiction are similar, county geographi-
cal jurisdiction under CPL 20.40 is less strict ("bestowed more
liberally") than state geographical jurisdiction under CPL 20.20.

In sum, the Legislature intended the provisions of CPL 20.40
(2) to "prevent a miscarriage of justice" owing to county
jurisdictional "limits prescribed by the common law" (*Licen-
ziata*, 199 App Div at 111); and the Legislature also intended
that the provisions of CPL 20.40 sweep more broadly than CPL
20.20 as a general matter. By construing the statute to allow a
situation where there is geographical jurisdiction in the State
but not in any of its individual counties, the majority ignores
both propositions.

### Our Precedent and the Facts in This Case

The majority (like the courts below) takes the position that
our hands are tied by our precedent; that we must affirm
because we decided in *Matter of Taub v Altman* (3 NY3d 30
[2004]) that there is no venue in this kind of case. The logic un-
dergirding *Taub* and our earlier decisions in *Matter of Steingut
v Gold* (42 NY2d 311 [1977]) and *People v Fea* (47 NY2d 70
[1979]) does not, however, mandate an affirmance here, where
the facts are very different.

*Steingut, Fea* and *Taub* were animated by an apprehension
that particular effect jurisdiction—a legislative "exception" to
common-law conduct jurisdiction—might swallow up the
common-law "rule." Thus, in *Taub* we disclaimed the "Peo-
ple['s] assert[ion] that . . . the City [in this case, the State] may
be deprived of its ability to prosecute within its borders certain
crimes, of which it is undeniably the victim" (3 NY3d at 38),
because "particular effect jurisdiction is an *alternative* ground
for venue . . . invoked only when jurisdiction does not lie on
some other basis—such as the far more common scenario in
which evidence exists that conduct establishing an element of

the offense has occurred within" another New York county (*id.* at 38-39 [emphasis added]). We followed up this caveat with an even more explicit expression by stating that the criminal statute involved in *Taub* provided "jurisdiction will lie in any county where the defendant executed or mailed the [tax] return" (*id.* at 39). Similarly, in both *Fea* and *Steingut*, venue would have been proper in the New York county where the allegedly criminal conduct took place. There would have been no venue "gap" at common law, and the remedial nature of CPL 20.40 (2) (c) did not come into play.

In this case, however, county geographical jurisdiction could not lie in any New York county other than New York County; nor could geographical jurisdiction lie in any county under any theory of venue other than particular effect. Indeed, the majority appears to concede as much by suggesting that the Legislature might want to fill a perceived gap in the statute. Given that CPL 20.40 (2) (c) is remedial and that finding *no* jurisdiction in *any* county is contrary to legislative intent and objectionable as a matter of policy, there is no warrant for strictly construing this provision that, on its face, easily supports the grand jury's finding of particular effect jurisdiction in New York County (*see generally* McKinney's Cons Laws of NY, Book 1, Statutes § 141 ["In construing a statute which is ambiguous the construction to be adopted is the one which will not cause objectionable results"]). The majority has effectively rendered CPL 20.40 (2) (c) meaningless: on the one hand, it is "an *alternative* ground for venue . . . invoked only when jurisdiction does not lie on some other basis" (*Taub*, 3 NY3d at 38-39 [emphasis added]), but on the other hand (this case), it must be strictly construed and so may not be invoked in a situation where there is no alternative basis for geographical jurisdiction in any county despite the existence of geographical jurisdiction in the State (*see* majority op at 426-427).*

---

* The majority opinion has so eviscerated CPL 20.40 (2) (c) that it is questionable whether particular effect jurisdiction would lie, under the majority's analysis, in the very example that it cites—where a "culprit maliciously blows up a dam in Putnam County near the Westchester County line, thus flooding *some* Westchester territory" (majority op at 428 [emphasis added]). A Putnam County dam-breaker, even one who floods "some Westchester territory," cannot be said to have engaged in "conduct . . . violative of a statute intended to protect the integrity of the governmental processes or . . . harmful to the community as a whole," yet the majority twice quotes this standard with approval (*see* majority op at 427, quoting *Fea*, 47

Read together with CPL 20.10 (4), CPL 20.40 (2) (c) vests a county with jurisdiction over criminal

> "conduct [that] had, or was likely to have, [conse-quences which, though not necessarily amounting to a result or element of such offense, have a materi-ally harmful impact upon the governmental pro-cesses or community welfare of a particular jurisdic-tion, or result in the defrauding of persons in such jurisdiction] . . . , and was performed with intent that it would, or with knowledge that it was likely to, have such [consequences] therein."

The most direct effect of defendant's alleged perjury in this case would be to impede the Attorney General's investigation into anticompetitive practices in the tabletop market. The majority zeroes in on this, proclaiming that this is not an effect on the governmental processes of New York County. This analysis, however, misses the mark, particularly once the varnish of "strict construction" is stripped away from section 20.40 (2) (c) in light of the facts in this case.

The Donnelly Act vests the Attorney General with authority to conduct investigations as a *preliminary* to bringing judicial or grand jury proceedings (*see* General Business Law § 343). In this investigation, the Attorney General sent multiple subpoe-naed interrogatories from New York County to Federated while defendant was CEO, several of which asked about certain principals' meetings in New York County. Federated and the At-torney General entered into a confidentiality agreement while defendant was CEO of Federated, which specified that any is-sues of confidentiality or otherwise would be adjudicated in Supreme Court, New York County. The Attorney General was taking testimony from witnesses in New York County, which was the situs for every interview of a Federated employee or representative save defendant, who was interviewed in Ohio as a negotiated courtesy. Thus, there was sufficient evidence from which the grand jury might fairly and reasonably infer that the particular effect of defendant's alleged perjury—to thwart or slow down the progress of an antitrust investigation—was likely

---

NY2d at 76-77). It is interesting, too, to note that the dam example cited by the majority originated in Richard G. Denzer's practice commentary— mere paragraphs away from the statement that "[i]n general . . . multiple county jurisdiction or venue is bestowed more liberally than state jurisdic-tion" (McKinney's Cons Laws of NY, Book 11A, CPL 20.40, at 54 [1971 ed]).

to materially harm "governmental processes" in New York County, the probable venue for any eventual litigation. Any other result would reward a defendant whose perjury is successful, or would force the Attorney General to bring judicial or grand jury proceedings prematurely, without adequate preliminary inquiry.

Moreover, a secondary, but wholly foreseeable, effect of impeding the Attorney General's investigation into anticompetitive behavior would be to undermine competition in the tabletop market—in other words, hindering an investigation fosters the underlying anticompetitive conduct sought to be deterred and/or punished. While the Attorney General might have a statewide focus generally, the conduct giving rise to his investigation was, among New York counties, particularly concentrated in New York County—where the tabletop industry's showrooms were located and its trade shows were held, the "nerve center" of Federated's New York operations, and the site of its flagship Macy's and Bloomingdale's stores. The "community welfare" of a county such as New York County includes not only its residents, but also its businesses. As a result, there was sufficient evidence from which the grand jury might fairly and reasonably infer that the particular effect of defendant's alleged perjury—to reduce competition in the tabletop industry—was likely to materially harm the "community welfare" of New York County, where the industry was centered.

The final prerequisite for venue is defendant's intent or knowledge that his perjury would have a particular effect on New York County. Here, defendant corresponded with representatives from the Attorney General's office in New York County. As the longtime CEO of Federated, he had to have known that New York County was the focal point for the American tabletop industry and that Federated's "nerve center" in New York State is in Manhattan. Defendant, to whom the corporate law department reported, likely knew that Federated had signed a consent agreement dictating that any disputes would be litigated in Supreme Court in New York County. Finally, defendant likely knew that his former colleagues at Federated had been interviewed in New York County in connection with an antitrust investigation related to events during his tenure as CEO, that defendant was the only Federated representative interviewed outside New York County, and that defendant's own interview only took place in Ohio after requests to interview him in New York County had been rebuffed by his counsel. In light of these

facts, there is sufficient circumstantial evidence for the grand jury to have reasonably inferred that, more likely than not, defendant knew his alleged perjury was likely to have a particular effect on New York County.

## Conclusion

The majority appears to believe that we have been painted into a corner by the Legislature's inadvertence or drafting mistake, and that the only means of escape is new legislation. I disagree. Because neither CPL 20.40 (2) (c)'s text nor our precedents mandate otherwise, I would decide the issue before us as the Legislature intended it to be decided, and would conclude that there was sufficient evidence to support the grand jury's finding of particular effect jurisdiction in New York County. In light of the Court's decision to the contrary, however, there is now no doubt that curative legislation is required if the Attorney General wishes to avoid today's unpleasant outcome when he is forced to depose witnesses out of state in future investigations. As all prosecutors in New York should now realize, CPL 20.40 (2) (c) is a dead letter, except (perhaps) in the event a miscreant blows up a dam in Putnam County (*see supra* at 434 n).

Chief Judge KAYE and Judges SMITH and JONES concur with Judge CIPARICK; Judge READ dissents in a separate opinion in which Judges GRAFFEO and PIGOTT concur.

Order affirmed.